**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ROSA ELIDA CASTRO, et al.,** | : | |
| **Petitioners,** | : | |
| **v.** | : | **Civ. No. 15-6153 (Lead Case)** |
| | : | **and all related cases** |
| **U.S. DEPARTMENT OF HOMELAND** | : | |
| **SECURITY, et al.,** | : | |
| **Respondents.** | : | |

**Diamond, J.,**                                                        **February 16, 2016**

## M E M O R A N D U M

Petitioners—twenty-nine Central American women and their thirty-five minor children—were seized by the Department of Homeland Security within minutes of their illegal entry into the United States. Acting pursuant to the Immigration and Naturalization Act, DHS ordered their "expedited removal" after finding that none had a "credible fear" of torture or persecution upon return to Central America. See 8 U.S.C. § 1225(b)(1). Seeking habeas relief, Petitioners argue that the Act's credible fear evaluation process is inadequate, resulting in erroneous negative credible fear determinations. The Government responds that the INA restricts judicial review of expedited removal orders, and outright bars the review Petitioners seek. Petitioners counter that such a reading of the Act would unconstitutionally suspend the writ of habeas corpus. U.S. Const. art. I, § 9, cl. 2.

Petitioners' contentions have been rejected by almost every court to address them. I agree with those uniform rulings. The INA affords Petitioners extensive Executive Branch process, including an interview by a DHS asylum officer, followed by supervisory review and a hearing before an immigration court judge. The Act's restriction on Judicial Branch review of those Executive Branch determinations is constitutional.

## BACKGROUND

On November 16, 2015, Lead Petitioner, Rosa Elida Castro, filed a counseled Habeas Petition on behalf of herself and her minor child, A.A.G.C., challenging the validity of her expedited removal from this country.  (Doc. No. 1.)  She filed an Emergency Motion for Stay of Removal on November 19, 2015.  (Doc. Nos. 2, 3.)  That same day, with the Government's consent, I temporarily stayed Ms. Castro's removal while I determined whether this Court has subject matter jurisdiction over her Petition, Complaint, and Emergency Motion for Temporary Stay of Removal.  (Doc. No. 5); Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006) (Federal courts have "an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party."); United States v. Ruiz, 536 U.S. 622, 628 (2002) ("[A] federal court always has jurisdiction to determine its own jurisdiction.").  I ordered supplemental briefing on the jurisdictional issues.  (Doc. Nos. 5, 13, 20, 31.)

In the weeks that followed, thirty-four additional habeas challenges to the credible fear and expedited removal processes were filed in this District (six of which have since been voluntarily dismissed).  The matters were reassigned to me to determine whether this Court has subject matter jurisdiction.  (Doc. Nos. 16, 21, 24, 29, 42, 48, 50, 52.)  I have stayed the expedited removal of sixteen Petitioners.  (Doc. Nos. 5, 25, 36, 38, 41, 45, 51.)  Apparently, the Government has taken no further action to remove the remaining Petitioners.

### I.    The Challenged Removal Process

All fifty-four Petitioners illegally crossed the southern border of the United States.  (Aaron A. Hull Decl., Doc. No. 20, Ex. 3; Carl McClafferty Decl., Doc. No. 30, Ex. 1.)  Some entered by raft; others on foot.  (Doc. No. 20 at 11 n.6.)  The twenty-nine adult Petitioners allege that they fled domestic abuse and gang violence in their native countries.  (See, e.g., Doc. Nos. 1, 3.)  All

but two of the Petitioners were apprehended by DHS less than a mile from the border, less than an hour after crossing; two were apprehended three miles from the border, three hours after crossing. (McClafferty Decl.; Hull Decl.; Doc. No. 20 at 11 n.6; Doc. No. 35 at 13 n.9.)

When the adult Petitioners indicated during their initial screening an intention to apply for asylum based on a fear of persecution or torture upon removal, they became subject to the Act's "expedited removal" process.  See 8 U.S.C. § 1225(b)(1).  Petitioners are now detained pending removal at Berks County Residential Center in Leesport, Pennsylvania.  (See, e.g., Doc. No. 1 at ¶ 2.)

## II.      The Instant Litigation

Petitioners all challenge the expedited removal procedures and seek the same relief:  that I reject as erroneous DHS's negative credible fear determinations, vacate their expedited removal orders, and order DHS to restart the removal process.  (See, e.g., Doc. No. 1 at ¶¶ 16-17; Doc. No. 13 at 7.)  I have received extensive submissions from Petitioners, the Government, and a group of law professors as Amici Curiae.  (Doc. Nos. 1, 3, 13, 19, 20, 31, 35.)

Unfortunately, some of Petitioners' submissions generate more heat than light.  For instance, Petitioners confuse expedited removal and deportation.  See, e.g., Doc. No. 13 at 5 ("If the Government's jurisdictional position were now to prevail, it would be the first time in U.S. history that noncitizens facing deportation were denied access to the Great Writ to challenge the legal validity of their removal orders.").  As courts have repeatedly explained, however, expedited removal relates only to the Government's decision to exclude (or not to admit) an arriving alien; deportation relates to the expulsion of an alien who resides here.  See Landon v. Plasencia, 459 U.S. 21, 25 (1982); Galindo-Romero v. Holder, 640 F.3d 873, 875 n.1 (9th Cir. 2011).  The law

governing each is distinct:  deportees have greater rights than those who are excluded.  Zadvydas v. Davis, 533 U.S. 678, 693, 721 (2001); Plasencia, 459 U.S. at 25-26.

Nor have all the Government's submissions been entirely helpful.  The Government has taken contradictory positions as to whether undocumented aliens seeking admission to the United States have any habeas rights.  Compare Doc. No. 10 in 15-cv-6279 ("Thus, non-admitted aliens lack Suspension Clause rights in relation to their admission."), and Doc. No. 20 at 5 ("[E]xpedited removal cases involving non-admitted aliens, including aliens apprehended almost immediately after an unlawful entry do not implicate [Suspension Clause] issues."), with Doc. No. 35 in 15-6153 ("Contrary to amici's framing of the argument . . . , the Government does not maintain that there is no Suspension Clause violation here merely because Petitioners are not lawfully admitted aliens."); see also Doc. No. 31 at 6 (during oral argument in Clark v. Martinez, 543 U.S. 371 (2005) Government acknowledges before the Supreme Court that illegal aliens have due process rights).

## EXPEDITED REMOVAL

The issues I must address are best evaluated with an understanding of how the challenged removal procedures came to be and how they operate.  The Government has submitted affidavits from the Chief of DHS's Asylum Division and other officials detailing Petitioners' apprehension and the expedited removal process.  (John L. Lafferty Decl., Doc. No. 20, Ex. 2; Brett Endres Decl., Doc. No. 20, Ex. 4; Hull Decl.; McClafferty Decl.)  Petitioners offer no evidence to contradict the Government's submissions, which I may consider in determining whether I have jurisdiction.  See Constitution Party of Pennsylvania v. Aichele, 757 F.3d 347, 358 (3d Cir. 2014) (When faced with a "factual attack" on jurisdiction—"an argument that there is no subject matter jurisdiction because the facts of the case"—"the District Court may look beyond the pleadings to ascertain the facts" relevant to the jurisdictional inquiry.).  Petitioners offer only the affidavit of

4

Lead Petitioner, who describes her reasons for seeking asylum.  (Rosa Elida Castro Decl., Doc. No. 3, Ex. 1.)  I will consider this affidavit as well.

## I.     Enactment

The Immigration and Naturalization Act, as adopted in 1952, included no expedited removal procedures.  See generally Immigration and Nationality Act, Pub. L. No. 82-414, 66 Stat. 163 (1952) (codified as amended in sections of 8 U.S.C.).  During the 1980s, expedited removal (known then as "summary exclusion") was first proposed in response to the flood of illegal immigrants into Southern Florida during the "Mariel boatlift."  See Alison Siskin & Ruth Ellen Wasem, Cong. Research Serv., RL33109, Immigration Policy on Expedited Removal of Aliens 3 (2006).  Congress sought to "stymie unauthorized migration by restricting the hearing, review, and appeal process for aliens arriving without proper documents at ports of entry."  Id.  That legislation was never enacted.  In 1993, the Clinton Administration proposed similar legislation "to target the perceived abuses of the asylum process by restricting the hearing, review, and appeal process for aliens at the port of entry."  Id.  Again, the proposed legislation failed.

With the 1996 passage of the Illegal Immigration Reform and Immigrant Responsibility Act, Congress amended the INA, codifying two procedures then known as "exclusion" (governing the removal of arriving aliens) and "deportation" (governing the removal of aliens residing in the United States).  Vartelas v. Holder, 132 S. Ct. 1479, 1484 (2012); see Pub. L. No. 104-208, 110 Stat. 3009 (1996). In thus enacting an "expedited removal" regime, Congress promulgated accelerated administrative procedures respecting the exclusion of certain inadmissible "arriving aliens."  8 U.S.C. § 1225(b)(1) (expedited removal procedures); see id. § 1252(e) (judicial review of expedited removal orders); see also Kucana v. Holder, 558 U.S. 233, 249 (2010) ("Congress

amended the INA aggressively to expedite removal of aliens lacking a legal basis to remain in the United States.").

Such expedition would be accomplished by conferring considerable authority to Executive Branch officers while restricting judicial review.  See Bakhtriger v. Elwood, 360 F.3d 414, 418 (3d Cir. 2004) ("In 1996, Congress enacted AEDPA and IIRIRA to reorder and curtail court review of deportation and exclusion decisions."), superseded by statute on other grounds, REAL ID Act of 2005, Pub. L. No. 109-13, § 106, 119 Stat. 231, 310-11 (2005); see also U.S. ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 543 (1950) ("[T]he decision to admit or to exclude an alien may be lawfully placed with the President, who may in turn delegate the carrying out of this function to a responsible executive officer of the sovereign, such as the Attorney General.").

These new procedures, codified in 8 U.S.C § 1225(b)(1), would "expedite the removal from the United States of aliens who indisputably have no authorization to be admitted to the United States, while providing an opportunity for such an alien who claims asylum to have the merits of his or her claim promptly assessed by officers."  H.R. Rep. No. 104-828, at 209-10 (1996) (Conf. Rep.).

## II.     Overview

Under the INA as amended, aliens not admitted or paroled following an initial inspection by an immigration officer may be designated for "expedited removal."  8 U.S.C. § 1225(b)(1).  If so, they are referred to an immigration officer for "screening."  Id. § 1225(b)(1)(A).  Should the officer determine that the alien is inadmissible—either because she lacks requisite documentation or seeks to gain entry through fraud or willful misrepresentation—she may be ordered "removed from the United States without further hearings or review."  Id. § 1225(b)(1)(A)(i).  If the alien intends to apply for asylum, however, "the officer shall refer the alien for an interview by an

asylum officer." Id. § 1225(b)(1)(A)(ii); see id. § 1158 (governing asylum). "The Asylum Program has a long-standing policy of allowing a minimum of 48 hours to transpire between the arrival of an alien at a detention site and any credible fear interview." Lafferty Decl. at ¶ 15. This interval permits the "alien an opportunity to rest, collect his or her thoughts, and contact a relative, representative, attorney, or friend to be present at the interview, as appropriate." Id.

At the Leesport facility (where all Petitioners are being held) "an Asylum Officer generally conducts a credible fear or reasonable fear interview within four to five days of the referral to [United States Citizenship and Immigration Services]." Id. at ¶ 18. During this interview, the officer seeks "to elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture." 8 C.F.R. § 208.30. The officer must determine that the alien has an "understanding of the credible fear determination process." Id. § 208.30(d)(2). A parent's credible fear determination may include an evaluation of her dependent child, or, upon request, the child may be separately evaluated. Id. § 208.30(b).

An alien has a "credible fear of persecution" if there exists "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum." 8 U.S.C. § 1225(b)(1)(B)(v); 8 C.F.R. § 208.30(e)(2). The alien has a "credible fear of torture" if "there is a significant possibility that he or she is eligible for withholding of removal or deferral of removal under the Convention Against Torture." 8 C.F.R. § 208.30(e)(3); see INS v. Cardoza-Fonseca, 480 U.S. 421, 440 (1987).

Any alien who makes out a credible fear is withdrawn from the expedited removal process for more extended consideration of her asylum application. 8 U.S.C. § 1225(b)(1)(B)(ii). If, however, the asylum officer determines the alien does not have a credible fear of persecution or

torture, the officer shall order the alien removed "without further hearing or review."  Id. § 1225(b)(1)(B)(iii)(I).  The officer must provide a written record of the determination, including a summary of material facts and a rationale for the decision.  Id. § 1225(b)(1)(B)(iii)(II).

The negative fear determination is not deemed "final" until it is approved by a "supervisory asylum officer."  8 C.F.R. § 208.30(e)(7).  The supervisory review process "is generally completed within 24 hours."  Lafferty Decl. at ¶ 12 ("A random sample of cases is also forwarded to Asylum Headquarters . . . for quality assurance purposes.").  If the negative credible fear determination is upheld, the alien may request a hearing before an immigration judge who must conduct a *de novo* review of that determination.  8 U.S.C. § 1225(b)(1)(B)(iii)(III);  8 C.F.R. §§ 1003.42(d), 1208.30(g)(2).  The alien is entitled to consult with a person of her choosing before the hearing, providing the consultation is "at no expense to the Government" and does not "unreasonably delay the process."  8 U.S.C. § 1225(b)(1)(B)(iv).  The immigration judge's review "shall include an opportunity for the alien to be heard and questioned by the immigration judge . . . . [and] shall be concluded as expeditiously as possible."  Id. § 1225(b)(1)(B)(iii)(III).

If the immigration judge upholds the negative fear determination, the "decision is final and may not be appealed."  8 C.F.R. § 1208.30(g)(2)(iv)(A).  "The [Immigration and Naturalization] Service, however, may reconsider a negative credible fear finding that has been concurred upon by an immigration judge after providing notice of its reconsideration to the immigration judge."  Id.

Aliens subject to expedited removal are detained by DHS throughout the administrative-review process and, if removed, are barred from reentry for five years.  8 U.S.C. §§ 1182(a)(9)(A)(i), 1225(b)(1)(B)(iii)(IV).

The Government offers evidence that from Fiscal Year 2006 to FY 2009, approximately 5,250 aliens a year expressed a fear of return to their native lands.  (Lafferty Decl. at ¶ 8.)  That number increased to 8,959 in FY 2010; 11,217 in FY 2011; 13,880 in FY 2012; 36,035 in FY 2013; and 51,001 in FY 2014.  (Id.)  In July 2015, 86.9% of individuals in DHS family residential centers (the only facilities authorized to house Petitioners) received a positive credible fear determination.  (Id. at ¶¶ 8, 14); see generally Flores v. Lynch, No. CV 85-04544 DMG (Ex), 2015 WL 9915880 (C.D. Cal. Aug. 21, 2015).  Moreover, in FY 2014 and FY 2015, immigration judges overturned approximately one in six negative credible fear determinations.  (Brett Endres Decl. at ¶¶ 3-4, Doc. No. 20, Ex. 4.)

Once again, Petitioners have offered no contradictory evidence, although they disparage the evidence submitted by the Government.  Doc. No. 31 at 13, 43 n.14 ("[T]he government's statistics are misleading . . . .").

### III.   Expansion

From April 1997 to November 2002, only aliens arriving at ports of entry were subject to expedited removal.  See Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures; Final Rule, 62 Fed. Reg. 10312-01 (Mar. 6. 1997); see also Siskin & Wasem, supra, at 2.  In 2002, the INS "clarified" that all arriving aliens could be subject to expedited removal.  See Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68924-01 (Nov. 13, 2002) ("A surge in illegal migration by sea threatens national

security by diverting valuable United States Coast Guard and other resources from counter-terrorism and homeland security responsibilities."); Siskin & Wasem, supra, at 2, 6.

In 2004, DHS further expanded its use of expedited removal procedures to all undocumented aliens who were: (1) apprehended within one hundred miles of the border, and (2) could not show that they have been present in the United States continuously for the fourteen days immediately before their seizure.  Designating Aliens for Expedited Removal, 69 Fed. Reg. 48877-01 (Aug. 11, 2004); Siskin & Wasem, supra, at 2-3, 6-7; see M.S.P.C. v. U.S. Customs and Border Prot., 60 F. Supp. 3d 1156, 1161-62 (D.N.M. 2014), vacated as moot, 2015 WL 745248 (D.N.M. Sept. 23, 2015).  DHS stated that this expansion would "enhance national security and public safety by facilitating prompt immigration determinations, enabling DHS to deal more effectively with the large volume of persons seeking illegal entry, and ensure removal from the country of those not granted relief."  Designating Aliens for Expedited Removal, 69 Fed. Reg. 48877-01 (Aug. 11, 2004).

## IV.    Judicial Review

The Courts of Appeal have exclusive jurisdiction to review general removal orders.  See REAL ID Act of 2005, Pub. L. No. 109-13, § 106, 119 Stat. 231, 310-11 (2005) (amending 8 U.S.C. § 1252).  The District Courts have jurisdiction to conduct limited habeas review of expedited removal orders.  8 U.S.C. § 1252(e)(2); see, e.g., Kamara v. Att'y Gen., 420 F.3d 202, 209 n.4 (3d Cir. 2005) (habeas review of expedited removal orders is "very limited").  The INA thus prohibits courts from "enter[ing] declaratory, injunctive, or otherwise equitable relief in any action pertaining to an [expedited removal] order," except in such cases where relief is explicitly authorized.  8 U.S.C. § 1252(e)(1)(A).  That authorization is found in § 1252(e)(2), which states:

Judicial review of any determination made under section 1225(b)(1) of this title [setting out expedited removal procedures] is available in habeas corpus proceedings, but shall be limited to determinations of—

(A) whether the petitioner is an alien,

(B) whether the petitioner was ordered removed under such section, and

(C) whether the petitioner can prove by a preponderance of the evidence that the petitioner is an alien lawfully admitted for permanent residence, has been admitted as a refugee under section 1157 of this title, or has been granted asylum under section 1158 of this title . . . .

Id. § 1252(e)(2)(A)-(C); see also id. § 1252(e)(5).

Section 1252(e)(5) clarifies (and limits) the "[s]cope of inquiry" for courts exercising jurisdiction pursuant to § 1252(e)(2)(B):

In determining whether an alien has been ordered removed under section 1225(b)(1) of this title, the court's inquiry shall be limited to whether such an order in fact was issued and whether it relates to the petitioner. There shall be no review of whether the alien is actually inadmissible or entitled to any relief from removal.

Id. § 1252(e)(5); see H.R. Rep. No. 104-828, at 220 (1996) (Conf. Rep.) ("The habeas corpus proceeding shall not address whether the alien is actually admissible or entitled to any relief from removal.").

Except as provided in § 1252(e), no court has jurisdiction to review: (1) "any individual determination or to entertain any other cause or claim arising from or relating to implementation of an [expedited removal] order"; (2) "a decision by the Attorney General" to invoke the expedited removal proceeding; and (3) the "procedures and policies adopted by the Attorney General to implement the [expedited removal] provisions." 8 U.S.C. § 1252(a)(2)(A)(i), (ii), (iv). Moreover, "no court shall have jurisdiction to review . . . the application of [section 1225(b)(1)] to individual aliens, including the [credible fear] determination made under section 1225(b)(1)(B)." Id. § 1252(a)(2)(A)(iii).

Finally, systemic challenges to the legality and constitutionality of the expedited removal regime may be brought only in the United States District Court for the District of Columbia within sixty days of the implementation of the challenged regulation or provision.  Id. § 1252(e)(3)(A)-(B); see Am. Immigration Lawyers Ass'n v. Reno, 18 F. Supp. 2d 38, 52-62 (D.D.C. 1998) (upholding expedited removal against various systemic and as-applied constitutional challenges), aff'd, 199 F.3d 1352 (D.C. Cir. 2000); H.R. Rep. No. 104-828, at 220 (1996) (Conf. Rep.) ("This limited provision for judicial review does not extend to determinations of credible fear and removability in the case of individual aliens, which are not reviewable.").

## DISCUSSION

### I.  Standards

#### A.  Emergency Stay of Removal

"A preliminary injunction is an extraordinary and drastic remedy."  Munaf v. Geren, 553 U.S. 674, 689-90 (2008) (internal quotation marks omitted); see Nken v. Holder, 556 U.S. 418, 433 (2009) ("'A stay is not a matter of right, even if irreparable injury might otherwise result.'" (quoting Virginian Ry. Co. v. United States, 272 U.S. 658, 672 (1926))).  Before granting a stay of removal, I must consider the traditional four-factor test governing preliminary injunctions:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

Nken, 556 U.S. at 425-26 (quoting Hilton v. Braunskill, 481 U.S. 770, 776 (1987)).  "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion."  Nken, 556 U.S. at 433-34.

### B.  Jurisdiction

"Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." Ex parte McCardle, 74 U.S. 506, 514 (1868); Arbaugh, 546 U.S. at 514 ("[W]hen a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety."); Fed. R. Civ. P. 12(h)(3) (same).

The jurisdiction of the lower federal courts is presumptively limited. Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994); see Sheldon v. Sill, 49 U.S. 441, 448 (1850) ("Congress, having the power to establish the courts, must define their respective jurisdictions."). They "possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." Kokkonen, 511 U.S. at 377 (internal citations omitted); Sheldon, 49 U.S. at 449 ("Courts created by statute can have no jurisdiction but such as the statute confers."). The party bringing an action in federal court thus must establish jurisdiction. See Kokkonen, 511 U.S. at 377.

### II.      This Court Is Without Jurisdiction to Hear Petitioners' Claims

Petitioners' challenge to the expedited removal process is not easily explained.   In Petitioners' view, if the INA precludes this Court's review of their negative credible fear determinations, the statute violates the Suspension Clause.  U.S. Const. art. I, § 9, cl. 2.  Petitioners urge me to avoid the constitutional issue.  See Doc. No. 13 at 4 ("The expedited removal statute does not preclude review of [Petitioners' claims], and in light of the serious constitutional concerns that would arise if it did, it must be read to permit review.").  In support, Petitioners invoke a well-settled principle of statutory construction:

> [I]f an otherwise acceptable construction of a statute would raise serious
> constitutional problems, and where an alternative interpretation of the statute is

"fairly possible," [courts] are obligated to construe the statute to avoid such problems.

INS v. St. Cyr, 533 U.S. 289, 299-300 (2001) (internal citation omitted).  The Third Circuit has applied this principle in construing statutory limitations on judicial review of alien detentions:

St. Cyr held that, absent a crystal clear repeal of jurisdiction to consider habeas claims by aliens, the provisions of AEDPA and IIRIRA that preclude judicial review would not be interpreted to repeal section 2241 jurisdiction. At least part of the reasoning behind this ruling was the desire to avoid the thorny constitutional question posed if Congress had entirely pre-empted review of an alien's claims.

Bakhtriger, 360 F.3d at 420; see, e.g., Kolkevich v. Att'y Gen., 501 F.3d 323, 332-36 (3d Cir. 2007); Sandoval v. Reno, 166 F.3d 225, 236-38 (3d Cir. 1999).

To avoid the Suspension Clause issue, Petitioners urge that the interplay between §§ 1252(e)(2)(B) and 1252(e)(5) creates an ambiguity respecting the Act's otherwise plain bar of judicial review.  The loophole that Petitioners urge would allow federal courts to review negative credible fear findings in select circumstances.  Petitioners urge that this limited habeas review would comport with the Suspension Clause.

Unfortunately for Petitioners, the Act's jurisdictional restrictions are manifest; there is no ambiguity at all.  To find otherwise would require me to do violence to the English language to create an "ambiguity" that does not otherwise exist.  This, I may not do.  See Kucana, 558 U.S. at 252 ("A statute affecting federal jurisdiction 'must be construed both with precision and with fidelity to the terms by which Congress has expressed its wishes.'" (quoting Cheng Fan Kwok v. INS, 392 U.S. 206, 212 (2010))); see Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 476 (1992) ("[C]ourts must give effect to the clear meaning of statutes as written.").

Petitioners argue that I have jurisdiction under § 1252(e)(2)(B), which allows me to review only "whether the petitioner was ordered removed" under the Act's expedited removal procedures.  They base that argument on § 1252(e)(5), which, as I have discussed, provides as follows:

14

Scope of Inquiry

      In determining whether an alien has been ordered removed under [the Act's expedited removal provisions], the court's inquiry shall be limited to whether such an order in fact was issued and whether it relates to the petitioner. There shall be no review of whether the alien is actually inadmissible or entitled to any relief from removal.

Petitioners believe that the only limitation this provision imposes on judicial review is included in its second sentence. Petitioners thus contend that, in determining (under § 1252(e)(2)(B)) "whether the petitioner was ordered removed," the courts are precluded (by § 1252(e)(5)'s second sentence) only from determining "whether the alien is actually inadmissible or entitled to any relief from removal." Petitioners urge that because they ask me to review the correctness of their negative credible fear determinations and the adequacy of the safeguards in the expedited removal process—and not to review whether each Petitioner is admissible to the United States—the Act imposes no bar to that limited review.

Surely to state Petitioners' argument is to refute it. They ask me to read § 1252(e)(5)'s second sentence not only in isolation from the first sentence, but also in isolation from the Act itself. See 8 U.S.C. § 1252(a)(2)(A)(iii), (e)(2). As I have discussed, the Act's restriction on judicial review is plain:

Judicial Review of [expedited removal orders] is available in habeas corpus proceedings, *but shall be limited to determinations of*—(A) whether the petitioner is an alien; (B) *whether the petitioner was ordered removed under such a section*; and (C) whether the petitioner can prove by a preponderance of the evidence that the petitioner is an alien lawfully admitted for permanent residence, has been admitted as a refugee . . . , or has been granted asylum.

Id. § 1252(e)(2) (emphasis added). Once again, Congress employed language that eliminates any doubt as to the Act's meaning: "[N]o court shall have jurisdiction to review . . . the application of [expedited removal proceedings] to individual aliens, including the [credible fear] determination made under section 1225(b)(1)(B)." Id. § 1252(a)(2)(A)(iii); see also H.R. Rep. No. 104-828, at

15

220 (1996) (Conf. Rep.) ("[D]eterminations of credible fear and removability in the case of individual aliens . . . are not reviewable.").

Congress could not have been clearer:  Under the Act, "no court"—including this Court—has jurisdiction to review the merits of a DHS credible fear determination.  Petitioners ask me simply to ignore these provisions, read § 1252(e)(5)'s second sentence in isolation, and so confound the primary purpose of the 1996 INA Amendments.  See Smith v. United States, 508 U.S. 223, 233 (1993) ("Just as a single word cannot be read in isolation, nor can a single provision of a statute."); United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371 (1988) ("Statutory construction, however, is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . .").

Petitioners argue that if I reject their reading of the Act, the second sentence of § 1252(e)(5) becomes "wholly superfluous," thus violating another canon of construction.  See Corley v. United States, 556 U.S. 303, 314 (2009) ("'[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'" (quoting Hibbs v. Winn, 542 U.S. 88, 101 (2004))).  I disagree.

The two sentences of § 1252(e)(5) serve different functions.  The first sentence limits only the scope of the habeas court's § 1252(e)(2)(B) inquiry.  Compare 8 U.S.C. § 1252(e)(2)(B) (Judicial review of expedited removal orders shall be limited to determinations of, *inter alia*, "(B) *whether the petitioner was ordered removed*.") (emphasis added), with id. § 1252(e)(5) ("In determining *whether an alien has been ordered removed* . . . , the court's inquiry shall be limited to whether such an order in fact was issued and whether it relates to the petitioner.") (emphasis added).  The second sentence—providing that "[t]here shall be no review of whether the alien is actually inadmissible or entitled to any relief from removal"—applies whenever a court is

exercising jurisdiction under any of the three permissible § 1252(e)(2) inquiries or reviewing a systemic challenge under § 1252(e)(3).  See H.R. Rep. No. 104-828, at 220 (1996) (Conf. Rep.) ("The habeas corpus proceeding shall not address whether the alien is actually admissible or entitled to any relief from removal.").

My reading of the Act is consistent with that of nearly every court to have addressed the Act's jurisdictional restrictions.   See, e.g., Shunaula v. Holder, 732 F.3d 143, 147 (2d Cir. 2013) ("We conclude that 8 U.S.C. § 1252(a)(2)(A) deprives this court of jurisdiction to hear [Petitioner's] collateral attack on his order of expedited removal."); Khan v. Holder, 608 F.3d 325, 329-30 (7th Cir. 2010) (same); Vaupel v. Ortiz, 244 F. App'x 892, 895 (10th Cir. 2007) (same); Avendano-Ramirez v. Ashcroft, 365 F.3d 813, 819 (9th Cir. 2004) (same); Li v. Eddy, 259 F.3d 1132, 1134-35 (9th Cir. 2001) (same), opinion vacated as moot on reh'g, 324 F.3d 1109 (9th Cir. 2003); Brumme v. INS, 275 F.3d 443, 448 (5th Cir. 2001) (same); M.S.P.C., 60 F. Supp. 3d. at 1164 (same); Diaz Rodriguez v. U.S. Customs and Border Prot., No. 14-CV-2716, 2014 WL 4675182, at *3 (W.D. La. Sept. 18, 2014) (same), vacated as moot sub nom. Diaz-Rodriguez v. Holder, No. 14-31103, 2014 WL 10965184 (5th Cir. Dec. 16, 2014); Torre-Flores v. Napolitano, No. 11-CV-2698-IEG (WVG), 2012 WL 3060923, at *2 (S.D. Cal. July 25, 2012) (same), aff'd, 567 F. App'x 523 (9th Cir. 2014); Al Khedri v. Sedlock, No. 09 C 6483, 2009 WL 3380681, at *2 (N.D. Ill. Oct. 20, 2009) (same).  But see Dugdale v. U.S. Customs and Border Prot., 88 F. Supp. 3d 1, 6 (D.D.C. 2015); Am.-Arab Anti-Discrimination Comm. v. Ashcroft, 272 F. Supp. 2d 650, 665-68 (E.D. Mich. 2003).

I recognize that absent judicial review, the chance of mistake and unfairness increases. See, e.g., Lennie B. Benson, Making Paper Dolls: How Restrictions on Judicial Review and the Administrative Process Increase Immigration Cases in the Federal Courts, 51 N.Y.L. Sch. L. Rev.

37, 60-61 (2006) (Agency decision making is often "non-responsive" and "prone to error.").  I may not, however, simply ignore the Act's jurisdictional restrictions.  See, e.g., Khan, 608 F.3d at 329 ("To say that this [expedited removal] procedure is fraught with risk of arbitrary, mistaken, or discriminatory behavior . . . is not, however, to say that courts are free to disregard jurisdictional limitations.").  Rather, I must construe the statute "with fidelity to the terms by which Congress has expressed its wishes.'"  Kucana, 558 U.S. at 252 (quoting Cheng Fan Kwok, 392 U.S. at 212); see Estate of Cowart, 505 U.S. at 476.

In sum, Petitioners have not made out a jurisdictional basis for this Court to hear their consolidated Petitions.  I will not rewrite the Act to create jurisdiction where none exists simply to avoid Petitioners' constitutional challenge.  Boumediene v. Bush, 553 U.S. 723, 787 (2008) (Courts "cannot ignore the text and purpose of a statute in order to save it.").

### III.    The Act's Limitation on Judicial Review Is Constitutional

Petitioners argue that if § 1252 bars them from collaterally attacking the merits of their negative credible fear determinations and the determination process itself on due process grounds, the Act violates the Constitution's Suspension Clause.  U.S. Const. art. I, § 9, cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion that public Safety may require it.").  Although I agree that Petitioners have habeas rights, I do not believe the Act violates those rights.  See 8 U.S.C. § 1252.

The Boumediene Court held that the Suspension Clause "has full effect at Guantanamo Bay."  553 U.S. at 771.  If foreign nationals seized and detained outside the United States have habeas rights, Petitioners—foreign nationals seized and detained on American soil—necessarily have habeas rights.  St. Cyr, 533 U.S. at 301-02 ("In England prior to 1789 . . . the writ of habeas corpus was available to nonenemy aliens as well as to citizens."); see Rasul v. Bush, 542 U.S. 466,

18

480 (2004) ("Whatever traction the presumption against extraterritoriality might have in other contexts, it certainly has no application to the operation of the habeas statute with respect to persons detained within 'the territorial jurisdiction' of the United States." (quoting Foley Bros., Inc. v. Filardo, 336 U.S. 281, 285 (1949))); see also Sandoval, 166 F.3d at 238 ("[T]he Supreme Court has repeatedly recognized that aliens may press statutory claims in habeas proceedings . . . .").

I must thus determine the scope of Petitioners' habeas rights. This is not an easy task. The habeas rights of the alien prisoners in Boumediene—who sought to challenge their indefinite imprisonment—are likely broader than those of Petitioners here, who seek to challenge their expedited removal. Boumediene, 553 U.S. at 785 ("[Given] that the consequence of error *may be detention of persons for the duration of hostilities that may last a generation or more*, [the risk of error] is a risk too significant to ignore.") (emphasis added); see id. at 779 ("[Habeas corpus'] precise application and scope change[s] depending upon the circumstances."); see generally Gerald L. Neuman, The Habeas Corpus Suspension Clause After *Boumediene v. Bush*, 110 Colum. L. Rev. 537, 578 (2010) ("[Boumediene] leaves open as many questions as it settles about the operation of the [Suspension] Clause . . . .").

The Boumediene Court emphasized the following factors in determining the scope of an alien's Suspension Clause rights: (1) historical precedent, id. at 745-52; (2) separation-of-powers principles, id. at 741-46; (3) the gravity of the petitioner's challenged liberty deprivation, id. at 739-44; and (4) a balancing of the petitioner's interest in more rigorous administrative and habeas procedures against the Government's interest in expedited proceedings, id. at 766, 779-86, 793-98. See Boumediene, 553 U.S. at 733 ("[C]ase law does not contain extensive discussion of standards defining suspension of the writ or of circumstances under which suspension has

occurred."); cf. Plasencia, 459 U.S. at 34 ("The constitutional sufficiency of procedures provided in any situation, of course, varies with the circumstances."); Neuman, supra, at 537 ("The constitutionally necessary scope of review is determined partly by historical inquiry, and partly by an instrumental balancing test.").

These factors establish that Petitioners have only limited habeas rights to challenge the procedural and substantive soundness of their negative credible fear determinations and expedited removal orders. The Act's restriction on judicial review does not offend those rights.

### A. Substantive Challenge

Whether the Act's habeas restrictions are permissible turns on a determination of which Executive Branch decisions must, under the Suspension Clause, be subject to habeas review. This is an extremely complex question that itself turns, in part, on the underlying Executive action. See St. Cyr, 533 U.S. at 301 ("At its historical core, the writ of habeas corpus has served as a means of reviewing the legality *of Executive detention*.") (emphasis added); Zadvydas, 533 U.S. at 694 (The nature of constitutional protections afforded to an alien "may vary depending upon status and circumstance."); Plasencia, 459 U.S. at 34 (same).

The first Boumediene factor—historic precedent respecting the Writ's scope—suggests strongly that the Suspension Clause does not require judicial review of purely factual determinations or mixed fact and law determinations made in the context of alien exclusion. St. Cyr, 533 at 301, 304-09 ("[A]t the absolute minimum, the Suspension Clause protects the writ 'as it existed in 1789.'" (quoting Felker v. Turpin, 518 U.S. 651, 663-64 (1996)); M.S.P.C., 60 F. Supp. 3d at 1170 ("Although St. Cyr stated that 'some judicial intervention in deportation cases is unquestionably required by the Constitution,' it did not define the scope of review in exclusion cases.") (internal citations omitted); see generally Neuman, supra, at 546 n.55 ("It is also unclear

to what extent the Court's reference to erroneous 'application' of law requires review of so-called mixed questions of law and fact.").

After St. Cyr, the Third Circuit reviewed the Writ's historic application and interpreted its statutory habeas jurisdiction over "questions of law" in (non-expedited) removal cases to "include issues of application of law to fact, *where the facts are undisputed and not the subject of challenge*." Bakhtriger, 360 F.3d at 420 (emphasis added); Kamara, 420 F.3d at 211 (same); Francois v. Gonzales, 448 F.3d 645, 648 (3d Cir. 2006) (same); cf. St. Cyr, 533 U.S. at 301 (An immigration statute that "entirely preclude[s] review of a *pure question of law* by any court would give rise to substantial constitutional questions.") (emphasis added).  In so holding, the Court nevertheless concluded that constitutionally adequate habeas proceedings in the immigration context need not "embrace review of the exercise of discretion, *or the sufficiency of the evidence*." Bakhtriger, 360 F.3d at 420, 423 ("[T]he actual reasoning in the St. Cyr decision compels the conclusion that under section 2241 . . . the broader species of review for substantial evidence and abuse of discretion typical of [Administrative Procedures Act] challenges must be wholly out of bounds.") (emphasis added); Gotowicz v. Att'y Gen., 171 F. App'x 948, 949-50 (3d Cir. 2006) ("[O]ur jurisdiction does not extend to a review of discretionary decisions, the sufficiency of evidence, or factual issues in the proceedings below."); see Khozhaynova v. Holder, 641 F.3d 187, 192 (6th Cir. 2011); Viracacha v. Mukasey, 518 F.3d 511, 515 (7th Cir. 2008).

Although Petitioners frame their arguments creatively, their challenge to the merits of their negative credible fear determinations is a mixed question of law and disputed fact.  Bakhtriger, 360 F.3d at 425 ("The fact that there are legal principles that govern these matters, however, does not convert every question of fact or discretion into a question of law."); cf. Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 399 F.3d 248, 269 (3d Cir. 2005) (Ambro, J., concurring) ("A question of

law can be answered solely by determining what relevant law means . . . . A mixed question of fact and law can only be answered by both determining the facts of a case and determining what the relevant law means."); Negrete v. Holder, 567 F.3d 419, 422 (9th Cir. 2009) ("'[P]etitioner may not create the jurisdiction that Congress chose to remove simply by cloaking an abuse of discretion argument in constitutional garb.'" (quoting Torres-Aguilar v. INS, 246 F.3d 1267, 1271 (9th Cir. 2001))).

As their submissions well demonstrate, Petitioners challenge *the evidentiary sufficiency* underlying their negative credible fear determinations. Although unsupported by any evidence, Ms. Castro's Petition is replete with factual allegations that her negative credible fear determination was incorrect. See, e.g., Doc. No. 1 at ¶ 50 ("Rosa was sick, disoriented, and traumatized when she was brought in her asylum interview."). Yet, Petitioners urge that their challenge is purely legal because "the asylum officer and immigration judge applied an erroneously high substantive standard." Doc. No. 13 at 3. Regardless of how Petitioners clothe their challenge, however, the Act does not permit me to reweigh the evidence presented to DHS. See 8 U.S.C. § 1252(a)(2)(A)(iii), (e)(2), (e)(5); cf. Rais v. Holder, 768 F.3d 453, 462 n.17 (6th Cir. 2014) ("[A] petitioner cannot create jurisdiction by alleging nothing more than a challenge to the [administrative agency's] discretionary and fact-finding exercises cloaked as a question of law.") (internal quotation marks omitted). That restriction does not run afoul of the Suspension Clause. Bakhtriger, 360 F.3d at 420; Viracacha, 518 F.3d at 515; Puri v. Gonzales, 464 F.3d 1038, 1042 (9th Cir. 2006); M.S.P.C., 60 F. Supp. 3d at 1170; see Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 212 (1953) ("[T]he Attorney General cannot be compelled to disclose the evidence underlying his determinations in an exclusion case . . . . [C]ourts cannot retry the determination of the Attorney General."); Knauff, 338 U.S. at 543 ("[I]t is not within the province

of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien."); <u>Nishimura Ekiu v. United States</u>, 142 U.S. 651, 660 (1892) (same).

Petitioners rely heavily on decisions from the so-called "finality era."  (Doc. No. 13 at 15-20.)  They place special emphasis on the Supreme Court's statement in 1953 that the immigration statute in force from 1891 until 1952 (when the INA was enacted) "had the effect of precluding judicial intervention *in deportation cases* except insofar as it was required by the Constitution." <u>Heikkila v. Barber</u>, 345 U.S. 229, 234-35 (1953) (emphasis added); <u>St. Cyr</u>, 533 U.S. at 304; <u>see also</u> <u>Sandoval</u>, 166 F.3d at 233-34 (discussing the finality era in dicta).  Petitioners thus urge that the scope of constitutionally required habeas jurisdiction is defined in immigration decisions rendered between 1891 and 1952.  <u>See</u> Doc. No. 13 at 16 ("[D]uring this long 60-year stretch (referred to as the 'finality' era), a court asked to review an immigration order could do so only if review was mandated by the Suspension Clause.").

This argument is flawed in several respects.  Petitioners implausibly assume that the meaning of a seldom-interpreted constitutional provision (i.e., the Suspension Clause), is defined by implication through a series of decisions that do not even address the Clause itself.  <u>See, e.g.</u>, <u>United States ex rel. Accardi v. Shaughnessy</u>, 347 U.S. 260 (1954); <u>Wong Yang Sung v. McGrath</u>, 339 U.S. 33 (1950); <u>Gegiow v. Uhl</u>, 239 U.S. 3 (1915); <u>Ekiu</u>, 142 U.S. at 651.  On the contrary, in <u>Zakonaite v. Wolf</u> (a finality era case), the Court summarily rejected a constitutional argument similar to that Petitioners raise here—i.e., that the immigration statute "violates the constitutional guaranty" of habeas corpus—noting that it was "without substance, and require[s] no discussion." 226 U.S. 272, 275 (1912).

As I have discussed, Petitioners also argue mistakenly that *expedited* removal proceedings are akin to the deportation proceedings discussed in Heikkila.  Once again, procedures governing *exclusion* and those governing *deportation* are subject to different constitutional requirements. See, e.g., Plasencia, 459 U.S. at 26 ("[T]he alien who loses his right to reside in the United States in a deportation hearing has a number of substantive rights not available to the alien who is denied admission in an exclusion proceeding."); M.S.P.C., 60 F. Supp. 3d at 1168.

Moreover, throughout the finality era, the Supreme Court reaffirmed Congress's power to vest Executive officers with *exclusive* fact-finding authority respecting the admission of aliens.  As the Ekiu Court held, when Congress makes "final" the Executive Branch's admission and exclusion factual findings, the Judicial Branch is not "at liberty to re-examine or controvert the sufficiency of the evidence on which [those officers] acted."  Ekiu, 142 U.S. at 660; Mezei, 345 U.S. at 212, 215 (same); Fok Young Yo v. United States, 185 U.S. 296, 305 (1902) (same); Lem Moon Sing v. United States, 158 U.S. 538, 545 (1895) (same); Fong Yue Ting v. United States, 149 U.S. 698, 714 (1893) (same); see Heikkila, 345 U.S. at 233-34 ("Relying on the peculiarly political nature of the legislative power over aliens, the [Ekiu] Court was clear on the power of Congress to entrust the final determination of the facts in [exclusion] cases to executive officers.").

Plainly, historical precedent weighs heavily against Petitioners' habeas challenge to their negative credible fear determinations.  Because my analysis of the three remaining Boumediene factors is the same for both Petitioners' substantive and procedural claims, I discuss them below.

### B. Procedural Challenge

Petitioners contend that, by precluding them from collaterally attacking their expedited removal orders on due process grounds, § 1252(e)(2) effects an unconstitutional suspension of the Writ.  I do not agree.

First enacted in 1996, expedited removal is a recent innovation; U.S. asylum policy is similarly novel, first devised after World War II.  See Ruth Ellen Wasem, Cong. Research Serv., RL32621, U.S. Immigration Policy on Asylum Seekers 3-7 (2005) (tracing the history of asylum). Historical precedent (the first Boumediene factor) thus does not neatly resolve whether Petitioners must be afforded habeas review of the procedural soundness of their negative credible fear determinations—even though Petitioners lack habeas rights to challenge the merits of those determinations.  See Demore v. Kim, 538 U.S. 510, 537-39 (2003) (O'Connor, J., concurring in the judgment) (discussing the dearth of founding-era immigration habeas case law).

Broadly speaking, history—especially post-Boumediene history—suggests that the Act's foreclosure of Petitioners' procedural challenge is permissible.  Khan, 608 F.3d at 327 (joining other circuits holding "that constitutional and statutory claims arising in expedited removal proceedings are not reviewable"); Shunaula, 732 F.3d at 145-46 (same);; Garcia de Rincon, 539 F.3d at 1140-41 (same); M.S.P.C., 60 F.3d at 1176 (same); Diaz Rodriguez, 2014 WL 4675182, at *4 (same); see Vaupel, 244 F. App'x at 895 (same); Lorenzo v. Mukasey, 508 F.3d 1278, 1281 (10th Cir. 2007) (same); see also Knauff, 338 U.S. at 542-44 ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned."); Mezei, 345 U.S. at 212 (same); Ekiu, 142 U.S. at 660 (same); Am. Immigration Lawyers Ass'n, 18 F. Supp. 2d at 53-

57; see generally David A. Martin, Two Cheers for Expedited Removal in the New Immigration Laws, 40 Va. J. Int'l L. 673, 688-92 (2000).

The remaining Boumediene factors also weigh against Petitioners' Suspension Clause arguments.  Separation-of-powers principles "must inform the reach and purpose of the Suspension Clause."  Boumediene, 553 U.S. at 746.  In conducting this analysis, I am mindful of the Supreme Court's repeated admonition: "'[O]ver no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens."  E.g., Fiallo v. Bell, 430 U.S. 787, 792 (1977) (quoting Oceanic Navigation Co. v. Stranahan, 214 U.S. 320, 339 (1909)); see id. ("[I]n the exercise of its broad power over immigration and naturalization, 'Congress regularly makes rules that would be unacceptable if applied to citizens.'" (quoting Mathews v. Diaz, 426 U.S. 67, 80 (1976))); Kleindienst v. Mandel, 408 U.S. 753, 766 (1972) ("The Court without exception has sustained Congress' 'plenary power to make rules for the admission of aliens and to exclude those who possess those characteristics which Congress has forbidden.'" (quoting Boutilier v. INS, 387 U.S. 118, 123 (1967))); see also Hiroshi Motomura, Immigration Law After a Century of Plenary Power: Phantom Constitutional Norms and Statutory Interpretation, 100 Yale L.J. 545, 547 (1990).

The Supreme Court and the Circuits have cautioned similarly respecting Executive Branch authority to implement congressional measures respecting alien exclusion.  See INS v. Aguirre-Aguirre, 526 U.S. 415, 425 (1999) ("[W]e have recognized that judicial deference to the Executive Branch is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations.'" (quoting INS v. Abudu, 485 U.S. 94, 110 (1988))); Plasencia, 459 U.S. at 32; Mezei, 345 U.S. at 210; Jean v. Nelson, 727 F.2d 957, 964 (11th Cir. 1984) (en banc), aff'd, 472 U.S. 846 (1985); see generally Adam B. Cox & Cristina M. Rodríguez, The President and Immigration Law, 119 Yale L.J. 458, 483-85 (2009).

The course Petitioners urge would force the courts into an area traditionally reserved for Congress and the Executive.  Separation-of-powers principles thus weigh heavily against Petitioners.

The next Boumediene factor (the gravity of the petitioner's challenged liberty deprivation) also weighs against Petitioners.  "[A]n alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application." Plasencia, 459 U.S. at 32; Knauff, 338 U.S. at 542 (same).  Furthermore, Petitioners' detention is only a secondary, temporary, and constitutionally permissible aspect of the expedited removal process. Demore, 538 U.S. at 531 ("[D]etention during [deportation] proceedings is a constitutionally valid aspect of the process . . . ."); see Wong Wing v. United States, 163 U.S. 228, 235 (1896).  Because the challenged removal procedures are expedited, the concomitant detention is necessarily brief.   8 U.S.C. § 1225(b)(1)(B)(iii)(III) (Immigration Judge review of credible fear determinations "shall be concluded as expeditiously as possible, to the maximum extent practicable within 24 hours, but in no case later than 7 days after" the determination.); Lafferty Decl. at ¶ 22 ("For credible fear cases screened from October 2014 through June 2015, the Asylum Division has completed more than 90% of the cases in 14 calendar days or less.").

As Petitioners apparently acknowledge, they have lesser liberty interests to vindicate through habeas than did the prisoners in Boumediene.  Doc. No. 13 at 11 ("[A] challenge to detention is different than a challenge to a removal order."); see Boumediene, 553 U.S. at 783 ("The intended duration of the detention and the reasons for it bear upon the precise scope of the [habeas] inquiry."); M.S.P.C., 60 F. Supp. 3d at 1171 ("For aliens that Congress wants to refuse admission into the country, and to detain only for as long as necessary to carry out the exclusion, the liberty interests are far different [than in Boumediene], and thus, the adequacy of the substitute

procedures for habeas corpus will likewise be very different."); accord Zadvydas, 533 U.S. at 690; United States v. Salerno, 481 U.S. 739, 750-51 (1987).

The final Boumediene factor (the balancing of Petitioners' interests against those of the Government) presents a closer question.  See Boumediene, 553 U.S. at 781 ("The idea that the necessary scope of habeas review in part depends upon the rigor of any earlier proceedings accords with our test for procedural adequacy in the due process context.").   Aliens who enter this country illegally—especially those fleeing persecution or torture—have a substantial interest in the rigor and fairness of the process by which it is determined whether or not they will be excluded.   See, e.g., Neuman, supra, at 576-77; E. Lea Johnston, An Administrative "Death Sentence" for Asylum Seekers: Deprivation of Due Process Under 8 U.S.C. § 1158(d)(6)'s Frivolousness Standard, 82 Wash. L. Rev. 831, 861-71 (2007); Dulce Foster, Judge, Jury and Executioner: INS Summary-Exclusion Power Under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 82 Minn. L. Rev. 209, 233-35 (1997).

Balanced against Petitioners' interest is the Executive's need for expedition and finality. The procedures Petitioners urge—necessitating pleadings, formal court proceedings, evidentiary review, and the like—would make expedited removal of arriving aliens impossible.   The Government urges, however, that expedited removal is essential to address the profusion of illegal immigration.  In FY 2013, for instance, 193,032 aliens were subject to expedited removal (36,035 of whom expressed a fear of return to their native lands).  (Doc. No. 20 at 7-8; Lafferty Decl. at ¶ 8.)  The Government seeks to employ its resources effectively by accelerating the removal of those who, because of their brief presence here—in Petitioners' case, from mere minutes to three hours—have the fewest ties and enforceable rights.  Plasencia, 459 U.S. at 32 ("[O]nce an alien gains admission to our country *and begins to develop the ties that go with permanent residence*

his constitutional status changes accordingly.") (emphasis added); see United States v. Verdugo-Urquidez, 494 U.S. 259, 271 (1990) (same).

Through expedited removal, the Executive also seeks to discourage foreign nationals from exposing themselves to the dangers associated with illegal immigration.  Designating Aliens for Expedited Removal, 69 Fed. Reg. 48877-01 (Aug. 11, 2004) ("There is an urgent need to enhance DHS's ability to improve the safety and security of the nation's land borders, *as well as the need to deter foreign nationals from undertaking dangerous border crossings,* and thereby prevent the needless deaths and crimes associated with human trafficking and alien smuggling operations.") (emphasis added); H.R. Rep. No. 104-469, pt. 1, at 117 (1996) ("The threat of expedited exclusion, which has been considered by Congress since 1993, may also have had a deterrent effect."); see generally Guillermo Alonso Meneses, Human Rights and Undocumented Migration Along the Mexican-U.S. Border, 51 UCLA L. Rev. 267 (2003).

Given that admission decisions are uniquely the Executive's, its interests here are considerable.  See, e.g., Plasencia, 459 U.S. at 34 ("The government's interest in efficient administration of the immigration laws at the border also is weighty. Further, it must weigh heavily in the balance that control over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature."); Fiallo, 430 U.S. at 792; Kleindienst, 408 U.S. at 766; cf. United States v. Flores-Montano, 541 U.S. 149, 152 (2004); United States v. Montoya de Hernandez, 473 U.S. 531, 544 (1985).

In these circumstances, I am compelled to conclude that although Petitioners have a considerable interest in rigorous administrative procedures, the Government's need for expedition and finality is greater still.

In sum, all four <u>Boumediene</u> factors counsel against expanding the scope of Petitioners' habeas rights to require judicial review of Petitioners' substantive and procedural challenges. Accordingly, I conclude that § 1252(e)(2) does not violate the Suspension Clause.

<u>**CONCLUSION**</u>

Because we are a nation of immigrants, it is vital, especially for those of us who are the children of immigrants, to ensure integrity and fairness in the immigration process.  All the goodwill in the world, however, cannot alter the Judiciary's necessarily limited role in the admissions process.  Congress has determined that expedited removal decisions—particularly the evaluation of credible fear claims—are best left to the Executive, not the courts.  Evidence submitted by the Government suggests that the great majority of those decisions favor aliens seeking admission.  That some are unfavorable does not create jurisdiction where none exists.

Because the Act provides no basis for exercising jurisdiction over the consolidated Petitions, and because that jurisdictional restriction is constitutional, I must dismiss the Petitions for want of subject matter jurisdiction. <u>Arbaugh</u>, 546 U.S. at 514.  I am also compelled to conclude that Petitioners' have no likelihood of success on the merits to support their Emergency Motions for Stay of Removal.  <u>Cf.</u> <u>Munaf</u>, 553 U.S. at 690; <u>M.S.P.C.</u>, 60 F. Supp. 3d at 1176.  Accordingly, I must deny those Motions and lift the temporary stays that were previously granted.

An appropriate Order follows.

*/s/ Paul S. Diamond*

_____

February 16, 2016                                        Paul S. Diamond, J.

30